Argued and submitted July 18, 2013, affirmed July 2, petition for review denied November 20, 2014 (356 Or 516)

Deborah NOBLE
and David Hillison,
*Petitioners-Appellants,*

*v.*

OREGON WATER RESOURCES DEPARTMENT
and Robert Lytle,
*Respondents-Respondents.*

Clackamas County Circuit Court
CV10010159; A148021

330 P3d 688

Brian J. Posewitz argued the cause and filed the briefs for appellants.

Inge D. Wells, Senior Assistant Attorney General, argued the cause for respondent Oregon Water Resources Department. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

No appearance for respondent Robert Lytle.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

Petitioners appeal following the circuit court's judicial review of an order by the Oregon Water Resources Department (the department) in other than a contested case. The order permitted petitioners' neighboring landowner, Lytle, to maintain a reservoir in a stream that runs on his property as well as petitioners' properties, with certain conditions. The circuit court set aside and remanded the order on the basis that Lytle's permit application was substantively deficient and that the department had misapplied the relevant statute, ORS 537.409, when it concluded otherwise. Petitioners now ask this court to reverse and remand the order on additional grounds. For the reasons that follow, we affirm.

The following facts are not in dispute. Petitioners, Noble and Hillison, each own property along a stream. The stream is an unnamed tributary to Beaver Creek, which flows into the Willamette River near Oregon City. Respondent Lytle also owns property along the stream, downstream from Noble and upstream from Hillison. A small dam along the stream on Lytle's property creates a reservoir. Lytle's reservoir was created sometime before he purchased his property in 1975. Lytle applied to the department for a reservoir permit under ORS 537.409, a statute that establishes an "alternate" and expedited permit application process for qualifying small reservoirs.

The owner of a small reservoir may apply for a permit for the reservoir under ORS 537.409 if, in addition to satisfying other criteria not at issue on appeal, the reservoir does not "pose a significant detrimental impact to existing fishery resources as determined by the State Department of Fish and Wildlife" and does not "injure any existing water right[.]" ORS 537.409(1). An application must include sufficient information to demonstrate that the reservoir meets those criteria. ORS 537.409(2). During a 60-day period after public notice of the application, any person may submit written comments and may request that the department deny the application on the basis that the reservoir "[w]ould pose a significant detrimental impact to existing fishery resources" or "[w]ould result in injury to an existing water

right[.]" ORS 537.409(5). In response to such a request, the department must conduct a public-interest review of the reservoir application. ORS 537.409(6). That review is limited to "issues pertaining to *** [w]ater availability[,] *** [p]otential detrimental impact to existing fishery resources[,] and *** [p]otential injury to existing water rights." *Id.* Within 180 days of receiving a permit application, the department must issue a final order "granting or denying the permit or granting the permit with conditions." ORS 537.409(7). If the department does not find "injury or impact under subsection (6) *** [and] issues a final order under subsection (7) *** allowing the issuance of a permit," the order is subject to review as provided in ORS chapter 183 as an order in other than a contested case. ORS 537.409(9)

Here, upon receiving Lytle's application, the department sent comment forms to the Oregon Department of Fish and Wildlife (Fish and Wildlife) and the Oregon Department of Environmental Quality (Environmental Quality) regarding the issues of harm to fishery resources and water rights. In response to the department's solicitation, a Fish and Wildlife fish biologist, Faucera, submitted comments to the department concluding that, although fish were present in the creek fed by the stream, Lytle's proposed reservoir would not "pose a significant detrimental impact to an existing fishery resource[.]" Faucera also indicated that certain specific conditions—namely, limiting the period of use of the reservoir from November through March and requiring installation of state-approved fish-screening and by-pass devices prior to diversion of any water—could be applied "to mitigate the detrimental impact to an existing fishery resource[.]" The Environmental Quality representative, Karen Williams, stated in her comments that she did not know whether the reservoir would "pose a significant detrimental impact to an existing fishery resource" because, "[a]ccording to [the department's] maps, a dam blocks fish passage to Beaver Creek."

Petitioners submitted comments to the department opposing issuance of the permit on the bases that the proposed reservoir "would have a significant detrimental impact on the fishery resource of the Unnamed Stream" and "also

would injure existing water rights." Petitioners requested that the department deny the application. Petitioners also requested that, if the department nevertheless determined that it would grant the permit, that the permit "be conditioned to limit the season of use to winter months (November through February), to require mechanisms for release of water during non-winter months, and to require structures sufficient to provide fish passage in all seasons." Petitioners further requested that the permit also be "conditioned to require suitable measuring devices, to require measuring and reporting by the permit holder, and to require mechanisms sufficient to ensure passage of water in excess of any legal impoundment rights." According to petitioners, the "latter conditions are necessary to make proper regulation of the permit possible."

Following a public-interest review, the department issued an order (Order #1) granting Lytle a permit. The permit required Lytle to adhere to the conditions suggested by Faucera—limitation of use to the months of November through March and installation, maintenance, and operation of fish-screening and by-pass devices consistent with department standards—as well as additional conditions requiring that Lytle provide for "means to evacuate water when determined necessary by the Water Resources Director to satisfy prior downstream water rights * * * [and] pass all live flow outside the storage season described * * *." The permit also granted the department the discretion to require Lytle to install a measuring device and to measure and report water use information. The department concluded that, as conditioned, the reservoir "will not injure any existing water rights and does not pose potential detrimental impacts to existing fishery resources."

Petitioners sought judicial review of Order #1. However, the parties subsequently agreed to try to resolve the dispute through mediation. Pursuant to that agreement, the department withdrew Order #1 and, along with it, Lytle's permit.

The mediation failed and the department reprocessed Lytle's application. The department solicited and received comments from the local watermaster as well as a

second set of comments from Faucera at Fish and Wildlife. The watermaster concluded that the proposed reservoir had "the potential to injure existing water rights[,]" but that conditions could "be applied to mitigate the potential injury to existing water rights[.]" Regarding mitigation, the watermaster opined:

> "Based on my experience with this stream and Beaver Creek mainstem, Nov 1 - May 31 is a more realistic storage season. Both streams are regulated every year to satisfy senior rights. Permit should be conditioned to limit storage to that period.

> "Also, condition with a staff gage that measures the entire range and stage between full reservoir level and dead pool storage."

In Faucera's new round of comments, she stated that she had observed that various fish were present in the stream and that the reservoir "may impact water quality in downstream waters, which may impact native fish." Faucera concluded that the proposed reservoir would "pose a significant detrimental impact to an existing fishery resource" and, more specifically, that "[a]ny diversion or appropriation of water for storage during the period June through October poses a significant detrimental impact to existing fishery resources." Faucera also concluded that the same conditions that she had proposed previously—limitation of use to certain months and installation of fish screening and by-pass devices—would "mitigate the significant detrimental impact" and "help protect downstream waters and fish populations."

The department then issued a second final order (Order #2) granting Lytle a permit, concluding again that, as conditioned, the reservoir "will not injure existing water rights and does not pose potential detrimental impacts to existing fishery resources." The department again adopted the conditions recommended in the comments that it had solicited. Petitioners filed a petition for review, challenging Order #2. However, the department withdrew that order and the accompanying permit, based on a clerical error in the order.

The department subsequently re-evaluated the application, confirmed the review received from Fish and Wildlife regarding Order #2, as well as petitioners' comments, and issued a third final order and permit, which the department asserted was "conditioned to address concerns raised in both that review and the comments received, where appropriate." That order is the subject of this appeal and contains the following pertinent findings:

"5.   Water is available in the unnamed stream, tributary to Beaver Creek, for the proposed use according to the Department's water-availability model and the watermaster's assessment.

"* * * * *

"17.   Because water is available, the Department finds that existing water rights would not be injured by the proposed use. Should water not be available to senior water rights in the future, this relatively junior allocation would be regulated according to the doctrine of prior appropriation.

"18.   Based upon information provided by [Fish and Wildlife], the Department has determined that as conditioned, the proposed use will not pose a significant detrimental impact to existing fishery resources."

The permit included the same, or substantively similar, mitigating conditions, and mandatory and discretionary monitoring and reporting requirements, that were contained in the permit granted by Order #2.

Petitioners sought judicial review of the department's ultimate order, alleging, *inter alia*, that Lytle's application did not contain, as required by ORS 537.409(2), sufficient information to demonstrate that the reservoir was eligible for the alternate permit application process (*i.e.*, that it would not injure any existing water right or pose significant detrimental impact to existing fishery resources). Petitioners also argued that the order erroneously interpreted ORS 537.409 as requiring a showing of no "significant" detrimental impact to existing fishery resources when the appropriate standard is no "potential" detrimental impact. Petitioners additionally asserted that substantial evidence did not support the department's findings that the reservoir permit would not injure existing water rights

or, as conditioned, pose a significant detrimental impact to existing fishery resources.[1]

The Clackamas County Circuit Court held an evidentiary hearing on the petition. In support of their case, petitioners submitted dozens of exhibits and called 13 witnesses, including department employees, Environmental Quality employees, Fish and Wildlife employees, a watermaster, and two independent experts—a hydrologist and an aquatic biologist. Petitioners' witnesses included Faucera and several other state agency employees who were directly involved with the review of Lytle's application. The department called an additional five witnesses: four from the department—a water resources engineer, a watermaster, a division administrator, and the deputy director—and a Fish and Wildlife fish biologist.

Petitioners elicited testimony that they contended undermined or contradicted the data and conclusions that the department and the other state agencies relied on in concluding that the Lytle reservoir satisfied the criteria of ORS 537.409. The department elicited testimony that it urged demonstrated that the state agencies had carefully weighed ample evidence in arriving at their conclusions that the reservoir satisfied ORS 537.409.

The court set aside and remanded the order on the ground that the "application was insufficient to initiate an ORS 537.409 permit review process, because it did not proffer credible data that demonstrated compliance with all statutory eligibility criteria." The court rejected petitioners' remaining arguments. The court declined to consider petitioners' argument that the department erroneously interpreted the statutory standard, concluding that that argument was actually "an indirect attack on the vagueness of ORS 537.409, a question not properly before this court." Thus, the court applied the "substantial detrimental impact" standard as it reviewed the record. The court made

---

[1] In a separate appeal, petitioners challenged a subsequent related order by Fish and Wildlife approving a fishway that Lytle constructed to satisfy the conditions imposed by the department in the order at issue here. *See Noble v. Dept. of Fish and Wildlife*, 250 Or App 252, 279 P3d 345 (2012), *rev'd*, 355 Or 435, 326 P3d 589 (2014).

the following ruling regarding petitioners' substantial evidence contentions:

> "The parties elicited more than twenty hours of testimony and submitted more than 200 exhibits into the record in this case. It is clear that the parties disagree about [the department's] conclusions regarding the water availability and the impact on existing fishery resources in this case. However, each party elicited significant evidence in support of their divergent opinions on those issues. The court is convinced that neither party's position is definitive. Having considered the conflicting evidence, the court is confident that a reasonable person could agree with the agency's conclusions in the Final Order and Permit. Therefore the court must defer to the agency's choices regarding which conflicting evidence it relied upon[.]"

This timely appeal followed.

We first resolve the parties' dispute regarding the relevant quantum of "detrimental impact to existing fishery resources" that, pursuant to ORS 537.409(1), precludes the availability of the expedited permit process established by that statute. In their second assignment of error, petitioners argue that the circuit court "erred in not setting aside the final order on grounds the record cannot support a finding of no 'potential detrimental impact to existing fishery resources.'" Petitioners' argument thus consists of two parts: first, that "ORS 537.409 require[s] a finding of no 'potential detrimental impact'" and, second, that "the record cannot support that finding." The department counters that the applicable standard is "significant detrimental impact."

We review a circuit court's decision regarding an agency's interpretation of a statutory provision for legal error. *England v. Thunderbird*, 315 Or 633, 638, 848 P2d 100 (1993). Based on the plain language of ORS 537.409, we conclude that the applicable standard for approval or denial of a reservoir permit under that statute is whether the reservoir poses a "significant detrimental impact" to existing fishery resources. Because we reject the first part of petitioners' argument, regarding the relevant standard, we do not reach their attendant argument regarding the inadequacy of the evidence to satisfy that standard.

We begin by reviewing, in relevant part, the text of ORS 537.409. Under subsection (1) of that statute, an owner of a reservoir may only submit an application for a permit under that statute "if the reservoir * * * [d]oes not pose a significant detrimental impact to existing fishery resources * * *." Under subsection (5), "any person may submit detailed, legally obtained information in writing, requesting the department to deny the application for a permit on the basis that the reservoir * * * [w]ould pose a significant detrimental impact to existing fishery resources." Following such a request, subsection (6) requires the department to conduct a public-interest review of the application "limited to issues pertaining to[,]" in relevant part, "[p]otential detrimental impact to existing fishery resources[.]" Subsection (7) mandates that, within 180 days "after the department receives an application for a permit under subsection (1)," the department issue a final order "granting or denying the permit or *granting the permit with conditions*." (Emphasis added.) Pursuant to subsection (9), "[i]f the department does not find injury or impact under subsection (6) of this section and the department issues a final order under subsection (7) of this section allowing the issuance of a permit, the order shall be subject to judicial review."

To support their argument that ORS 537.409 requires a finding of "no potential detrimental impact" to existing fishery resources, petitioners necessarily focus on subsection (6), which contains the only reference in ORS 537.409 to "potential detrimental impact." But the text of subsection (6) does not require a finding that a reservoir poses no potential detrimental impact; instead, it limits the scope of any review conducted pursuant to subsection (5) to certain issues, including those "pertaining to * * * [p]otential detrimental impact * * *." Those are two distinct requirements, and petitioners' attempt to extrapolate from the latter to the former runs into multiple problems.

Foremost among those is the fact that ORS 537.409 expressly refers to "significant detrimental impact" multiple times as the relevant standard. Subsection (1) declares that the permit process under ORS 537.409 is only available for reservoirs that "do[] not pose a significant detrimental impact to existing fishery resources." And, perhaps

most damaging to petitioners' theory of the applicable standard, subsection (5) requires any person requesting that the department deny an application on the basis of detrimental impact to existing fishery resources, to submit "detailed * * * information in writing * * * that the reservoir * * * [w]ould pose a significant detrimental impact" to such resources.

In an attempt to reconcile these references to "significant detrimental impact" with their proffered interpretation of the relevant standard, petitioners ultimately narrow their argument to contend that subsection (6) "describes the substantive standard for decision" whenever someone requests the denial of an application. Petitioners offer no satisfactory explanation, nor can we discern any, for why the legislature would require an applicant to supply information demonstrating that the reservoir does not pose a "significant detrimental impact to existing fishery resources" and similarly require a party opposing an application to submit "detailed" information that the reservoir would pose a "significant detrimental impact," but then deny the applicant's requested permit if the applicant fails to satisfy a considerably stricter "potential detrimental impact" standard.

In an ultimately unavailing effort, petitioners argue that the legislative history of ORS 537.409 and related statutes, ORS 537.405 and ORS 537.407, supports their conclusion that the department must deny an application if the reservoir poses a "potential" detrimental impact. Through the passage of House Bill (HB) 2376, those three statutes were enacted as part of Oregon Laws 1995, chapter 752, and they all require the department to consider "significant detrimental impact." Only ORS 537.409 contains a reference to "potential detrimental impact." The first two statutes provide procedures for *exemption* or *certification* of pre-existing small reservoirs. *See* ORS 537.405 (exemption); ORS 537.407 (certification).[2] The statute at issue here, ORS

---

[2] More specifically, ORS 537.405 establishes the following exemption:

"Reservoirs in existence on or before January 1, 1995, that store less than 9.2 acre-feet of water or with a dam or impoundment structure less than 10 feet in height, are found to be a beneficial use of the water resources of this state. Except as provided in subsection (4) of this section, such reservoirs are exempt from regulation by the Water Resources Commission and the Water Resources Department and are not required to obtain a permit or certificate * * *."

537.409, establishes a *permitting* process for reservoirs not in existence or not approved by the state before January 1, 1995, *i.e.*, future reservoirs.[3]

Petitioners are correct that the legislative history reveals that this statutory differentiation of distinct reservoir classes reflects a legislative decision to regulate pre-existing small reservoirs more leniently than future reservoirs. *See, e.g.*, Tape Recording, House Water Policy Committee, HB 2376, Feb 2, 1995, Tape 13, Side B (statement of HB 2376 work group member Richard Kosesan that HB 2376 "deal[s] with ponds that are in existence, exempt[s] those ponds from permitting certification requirements * * * and deal[s] with future ponds in a different manner—basically set[s] up some harsher and stricter stipulations for the construction of future ponds"). Petitioners attempt to reason from that fact that the legislative history thus "shows that ORS 537.409 was meant to be more restrictive, and that the word 'potential' in ORS 537.409(6) was meant to convey a more restrictive substantive standard for 'alternate' permits when someone objects based on fishery and/or injury issues." However, the legislative history undermines that conclusion.

That history clarifies that the mechanism that the legislature established to regulate future reservoirs more strictly than pre-existing reservoirs was the overall permitting

ORS 573.405(1). And, pursuant to ORS 537.407, the "Water Resources Department shall issue a water right certificate to any person who submitted an application for a reservoir under section 4, chapter 595, Oregon Laws 1993." ORS 537.407(1).

[3] We use the terms "pre-existing" and "future" here because those are the terms that the legislature used when discussing the portions of HB 2376 that were ultimately enacted as ORS 537.405, ORS 537.407, and ORS 537.409. As the legislature did, we use those terms because they offer a useful shorthand for distinguishing between those reservoirs that qualify for approval under ORS 537.405 and ORS 537.407, and those which do not but which may qualify for a permit under the terms of ORS 537.409. We pause to clarify that, as the Supreme Court noted in *Noble*, 355 Or at 438 n 1, when discussing Lytle's reservoir and a second, neighboring reservoir,

"[b]ecause the Lytle and Stoyan dams existed before January 1, 1995, store less than 9.2 acre-feet of water, and are less than 10 feet in height, the owners could have notified [the department] of their existence on or before January 31, 1997, as provided in ORS 537.405, and obtained more or less automatic recognition that the dams and associated ponds were a beneficial use and exempt from most regulation by [the department]. Having failed to do so before the statutory deadline, the owners of the Lytle and Stoyan ponds proceeded under an alternative water right permit process, set out in ORS 537.409 * * *."

process, not the use of a standard stricter than that employed for pre-existing reservoirs. Kosesan explained that

> "the exemption applies to those existing ponds that do not injure existing water rights or do not pose a significant detrimental impact to fishery resources; we felt those were two very, very strong standards that we could use to look at the exemption. For future ponds, again the same size, 9.2 acre feet or less, individuals would be required to go through a process and obtain a water right permit; but again, we've used the standards of protection for fish and protection for existing water right holders."

Tape Recording, Senate Water and Land Use Committee, HB 2376, Apr 27, 1995, Tape 129, Side A (statement of Kosesan). For example, the process established for future reservoirs in ORS 537.409, unlike the exemption and certification procedures for pre-existing reservoirs, allows any person to oppose an application on the basis of sufficient detrimental impact to existing fishery resources and provides for public-interest review of contested applications. In other words, petitioners are correct that the legislature intended ORS 537.409 to be more restrictive than ORS 537.405 and ORS 537.407. However, we conclude, based on the legislative history as well as our earlier textual analysis, that the legislature chose to accomplish that intent by means of a stricter *procedure*, not by means of a stricter *standard* applied within that procedure. Thus, we reject petitioners' invitation to conclude that, in essence, the legislature intended ORS 537.409 to require the department to permit a reservoir that does not presently pose a "significant" detrimental impact—which, it bears articulating, allows for a reservoir that does, in fact, pose some detrimental impact, as long as that impact is not "significant"—but deny a permit if it poses any "potential" detrimental impact, *i.e.*, any chance of harm, present or future, on existing fishery resources.

Stated another way, given the language and logic of ORS 537.409, the word "potential" as used in that statute refers, not to a finding of *possible detrimental impact,* but, rather, to a *possible finding* of significant detrimental impact. Under the permit application process, an applicant must, first, "provide sufficient information to demonstrate" that a reservoir *"[d]oes not* pose a significant detrimental

impact to existing fishery resources as determined on the basis of information submitted by the State Department of Fish and Wildlife[.]" ORS 537.409(1), (2) (emphasis added). Once that information has been submitted and the applicant has made the required showing that the reservoir does not pose a significant detrimental impact, then, any person may submit detailed information "requesting the department to deny the application for a permit on the basis that the reservoir * * * *[w]ould* pose a significant detrimental impact * * *." ORS 537.409(5) (emphasis added). The shift from the present tense ("does not") in subsections (1) and (2), to the conditional mood ("would") in subsection (5), reflects the shift from the *actuality* of the applicant's showing that the reservoir poses no significant detrimental impact, to the *possibility*, introduced by the party opposing the application, that it does. With subsection (5), the legislature recognized that, although an applicant has already submitted information demonstrating that the reservoir poses no significant detrimental impact, an opposing party may be able to overcome that showing. Because that procedure precedes the public review in which the presence or absence of such impact will be conclusively determined, the conclusion that the reservoir does indeed pose a significant detrimental impact is merely "potential."

We turn now to petitioners' two remaining assignments of error, in which they assert that the circuit court erred in ruling that substantial evidence supports the department's findings that the reservoir would not injure existing water rights or, as conditioned, pose a significant detrimental impact to existing fishery resources. Like the circuit court, we conclude that the department's findings are supported by substantial evidence.

In review of an agency decision under ORS 183.484(5)(c), in other than a contested case, the circuit court "shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." "Whole record" review requires consideration of the facts before the agency when it issued the order, as well as additional evidence developed for the circuit court's review of that order, including

evidence that detracts from as well as supports the agency's order. *Norden v. Water Resources Dept.*, 329 Or 641, 647-49, 996 P2d 958 (2000); *Powell v. Bunn*, 198 Or App 21, 25 n 4, 108 P3d 37 (2005), *rev'd on other grounds*, 341 Or 306, 142 P3d 1054 (2006). On appeal, this court reviews the circuit court's judgment to determine whether it correctly assessed the agency's action under those standards. *G.A.S.P. v. Environmental Quality Commission*, 198 Or App 182, 187, 108 P3d 95, *rev den*, 339 Or 230 (2005). "In practical effect, that means that we directly review the agency's order for compliance with the standards set out in ORS 183.484(5)." *Id.* We do not reweigh or assess the credibility of the evidence in the record or substitute our judgment for that of the agency. *Middleton v. Dept. of Human Services*, 219 Or App 458, 473, 183 P3d 1041, *rev den*, 345 Or 94 (2008). Thus, "in a case in which expert opinions have been offered on both sides of an issue, it is usually clear that a factfinder has found one or the other more persuasive, and substantial evidence and reason will exist to support the finding, without further explanation." *Castro v. Board of Parole*, 232 Or App 75, 84, 220 P3d 772 (2009) (citing *Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988)).

We readily conclude that the record here, viewed as a whole, would permit a reasonable person to conclude that the reservoir does not injure existing water rights or, with the conditions imposed by the department in the permit, pose a significant detrimental impact to existing fishery resources.[4] Regarding impact to fishery resources, the record reveals that the department based its finding on,

---

[4] A main premise of petitioners' substantial evidence argument is that this court should categorically disregard the primary source of the department's finding, Fish and Wildlife's comments, because those comments only indicate how to mitigate what Faucera concluded would otherwise be a "significant" detrimental impact. Once that evidence is off the table, petitioners argue, very little evidence remains supporting the department's finding, and that evidence is undermined by petitioners' countervailing evidence. To the extent that petitioners' premise, in effect, merely restates their contention that the relevant standard is no "potential" detrimental impact, we have already rejected that argument. To the extent that, alternatively, petitioners mean to argue that Faucera stopped short of actually concluding that there is not a significant detrimental impact, we conclude that, based on the facts regarding Fish and Wildlife's comments, a reasonable person could conclude that Faucera intended to convey that the mitigating conditions that she recommended would render the detrimental impact posed by the reservoir less-than-significant.

among other considerations, comments from multiple state agencies, including, as contemplated by ORS 537.409(1), Fish and Wildlife. Based on factors such as fish distribution maps, aerial photography, and other state agency data, Fish and Wildlife concluded that the reservoir, as conditioned in the permit, would not pose a significant detrimental impact. Before the circuit court, as noted above, the department elicited testimony from multiple witnesses supporting that finding, including such unequivocal statements as Faucera's testimony that "[m]y belief is that if the permit and final order were conditioned with my recommendations, [the detrimental impact] would not be significant."

Significantly, even petitioners' own expert ultimately conceded when testifying before the circuit court that he did not have enough information to say that the Lytle reservoir itself posed a significant detrimental impact to existing fishery resources. To be sure, as the circuit court noted, petitioners also elicited significant evidence in support of their position. Their expert opined that the Lytle reservoir "is having some incremental detrimental impacts" on fish. And, their expert concluded that the Lytle reservoir "in combination with other reservoirs," namely, the Vityuk, Stoyan, Wacker, and Olson ponds, on the stream was "having a significant detrimental impact on cutthroat trout habitat[.]" Petitioners pointed out weaknesses in the testimony and opinions of the witnesses affiliated with the state, and they presented testimony from their own experts. However, as the circuit court noted in its ruling, "the choice between *which* conflicting evidence will be relied upon is up to the acting administrative body, provided that a reasonable person could agree with their conclusion after considering the evidence in the whole record." (Emphasis in original.)

We reiterate that substantial evidence review "does not require [a] reviewing court to 'explain away' conflicting evidence." *Norden*, 329 Or at 649; *see also Armstrong*, 90 Or App at 206 ("For instance, * * * if there are doctors on both sides of a medical issue, whichever way the [agency] finds the facts will probably have substantial evidentiary support. We would not need to choose sides."). As we previously noted in *Armstrong*, "[t]he difference between the 'any evidence' rule and the substantial evidence test * * * will be decisive only

when the credible evidence apparently weighs overwhelmingly in favor of one finding and the [agency] finds the other without giving a persuasive explanation." 90 Or App at 206. After hearing, in essence, the same arguments regarding the same evidence that the parties have presented to us, the circuit court concluded that this was not such a case. We agree.

Finally, we reject petitioners' argument regarding injury to existing water rights, because it is based on two faulty premises: First, that the department's finding is not supported by substantial evidence because it is premised on a condition imposed by the permit. Second, that absent that condition, there is insufficient evidence to support the finding that, according to petitioners, the department actually was supposed to make, namely, "a finding of no 'potential' injury to existing water rights." The first part of petitioners' conjunctive theory fails because, as the text of ORS 537.409 plainly states, the department may issue "a final order granting or denying the permit *or granting the permit with conditions.*" ORS 537.409(7) (emphasis added). The second part of petitioners' theory fails independently for the same reasons, articulated at length above, that we have rejected petitioners' similar argument regarding the appropriate standard for assessing detrimental impact to existing fishery resources.

In sum, we hold that the applicable standard for assessing detrimental impact to existing fishery resources under ORS 537.409 is whether a reservoir poses a "significant detrimental impact" to such resources. We also hold that the circuit court correctly concluded that substantial evidence supported the department's findings regarding injury to water rights and detrimental impact to fishery resources.

Affirmed.